UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCI SCIANNA and AMY LAMSON,<br><br>Plaintiffs,<br><br>v.<br><br>COSTCO WHOLESALE CORPORATION,<br><br>Defendant. | Case No. 18-cv-03145-NC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 56 |

Plaintiffs Marci Scianna and Amy Muscato Lamson bring claims for age discrimination, retaliation, breach of contract, and various wage and hour violations against their long-time employer, Costco. Dkt. No. 1. Costco moves for summary judgment on all claims. Dkt. No. 56. The Court FINDS that no genuine disputes of material fact exist as to the plaintiffs' age discrimination, retaliation, or various wage and hour claims, and further FINDS that the evidence shows that Costco is entitled to judgment as a matter of law as to all of the plaintiffs' claims except their breach of contract claim. The Court FINDS that there exist genuine issues of material fact as to whether Costco had good cause to terminate the plaintiffs, because the plaintiffs have presented evidence that they may have had an implied contract with Costco authorizing the conduct for which they were terminated. The motion for summary judgment is DENIED as to the plaintiffs' breach of contract claim.

## I. Background

### A. Undisputed Facts

#### 1. Plaintiffs Amy Lamson and Marci Scianna

Plaintiff Amy Lamson started working for Costco at its Santa Cruz warehouse in 1994. Dkt. No 56, Ex. A (Lamson Dep.) 42:1–3. Lamson worked as an Administration Supervisor from 1997 to 2012, until Costco determined that her position "no longer existed" and reclassified her as an hourly employee. Dkt. No. 62, Ex. 2 (Lamson Declaration) ¶ 1. Her duties as Administration Supervisor included maintaining the payroll and timekeeping system (called Work Force Central, or "WFC"), writing employee schedules, approving and inputting schedule changes, processing and approving vacation and sick time requests, and processing payroll. Lamson Decl. ¶ 2. When she was reclassified as an hourly employee in 2012, none of Lamson's duties or responsibilities changed (though her pay decreased). *Id*. These were her job responsibilities at the time of her termination in 2017. *Id*. Lamson was 43 years old at the time of her termination. Lamson Dep. 11:21–22.

Plaintiff Marci Scianna started working for Costco at its Santa Cruz warehouse in 1995. Dkt. No. 56, Ex. B (Scianna Dep.) 48:5–7. Scianna was Lamson's backup Payroll Clerk, and shared Lamson's duties. Dkt. No. 62, Ex. 3 (Scianna Declaration) ¶ 1–3. She was reclassified as an hourly employee in 2000, but still regularly filled in as a supervisor and retained the same duties and responsibilities as before her reclassification. Scianna Decl. ¶ 3. She had the same WFC access as Lamson. Scianna Dep. 57:14–58:18. Scianna was 42 years old at the time of her termination in 2017. Compl. at ¶ 1.

Generally, Costco warehouses are led by a general manager, three assistant general managers, and individual department managers. Lamson Decl. ¶ 3. The Administration Department at the Santa Cruz warehouse had no individual department manager as of at least 1997. *Id*. ¶ 4; Scianna Decl. ¶ 4. In lieu of a named Administration Department manager, Lamson fulfilled managerial responsibilities as Administration Supervisor until her reclassification in 2012. *Id*. Even after her position title changed in 2012, her duties

2

did not change. Lamson Decl. ¶ 3. Scianna similarly performed managerial duties. Scianna Decl. ¶ 5. For instance, they both ran inventories, drafted counseling notices and sat in on counseling and suspension meetings, managed facilities including remodels, processed member claims, and handled worker's compensation and OSHA claims. Lamson Decl. ¶ 6; Scianna Decl. ¶ 5. Scianna performed tasks typically reserved to managers, such as opening the front of the store by herself and removing jewelry from the vault and, at one point, holding an internal key to the warehouse. Scianna Decl. ¶ 5, 7. In 2016, Lamson and Scianna represented the Santa Cruz warehouse at a WFC conference for which Scianna was instructed to change her name badge to "Admin Manager" to attend. *Id*. ¶ 6.

Lamson and Scianna both had manager-level access to systems relating to their payroll duties. An Assistant General Manager gave them both manager codes to the Money In, Money Out system. Scianna Decl. ¶ 7. They had manager-level WFC access. *Id*. Scianna had an Administration Manager profile and password as well as a manager email address and profile. *Id*.

Costco Santa Cruz managers and employees regularly contacted Lamson and Scianna while they were not scheduled to work because Lamson and Scianna were so knowledgeable about warehouse operations. Lamson Decl. ¶ 16. They received texts and calls while off the clock almost daily, even in the middle of the night, but never reported this time worked to Costco because they saw it as doing their part for the team and felt happy to help out. Scianna Decl. ¶ 8; Lamson Decl. ¶ 16.

**2. Costco Santa Cruz's Scheduling Policies and Practices**

At the Santa Cruz Costco warehouse, employee schedules were posted three weeks in advance. Lamson Dep. 54:3–5. Lamson was responsible for posting the schedule for the Administration Department; she printed and posted a hard copy in the employee break room and in the office. Scianna Dep. 58:2–10. If an employee in any department wanted to make a change to a schedule after it was posted, he or she could do so by communicating with their supervisor or a manager. *Id*. At the Santa Cruz Costco

3

warehouse, scheduling changes were generally accommodated when possible and requests were granted unless they created a problem with coverage. Lamson Decl. ¶ 11; Dkt. No. 62, Ex. F (Addie Finnell Deposition) 44:18–45:3. Schedules were fluid and they continually changed up until the last minute to accommodate employees' needs. Dkt. No. 62, Ex. 4 (Anna Gizycki Declaration) ¶ 7. There was no written process for requesting a schedule change, such as a form, and no formal mechanism for confirming or auditing schedule changes. Lamson Decl. ¶ 11. Changes to employee schedules were not documented anywhere except in WFC. *Id*.

Employees swiped in and out of work using a physical time clock in the warehouse. Lamson Decl. ¶ 9. If unable to swipe in or out, employees used a physical "Exception Log" noting the time they clocked in or out of work. *Id*. A manager had to approve entries to the Exception Log. *Id*. Lamson and Scianna were then responsible for manually entering Exception Log data into the WFC system. *Id*. If an employee swiped in more than three minutes past his or her scheduled start time, the WFC system flagged a "tardy" with a red box around the entry. *Id*. ¶ 13; Lamson Dep. 149:9–14; Scianna Dep. 65:19 – 67:7. Managers could "excuse" a tardy before it was entered onto an employee's record. *Id*. The official Costco policy required a manager to issue a counseling notice to an employee after three tardies in one month, but if a counseling notice was not issued within three days, the tardy would lapse and no notice could be issued. Finnell Dep. 53:18–20. The policy of issuing counseling notices for tardies was selectively enforced at the Santa Cruz warehouse and many incidents lapsed because no notices were issued. Lamson Decl. ¶ 13. Though Costco policy stated that three counseling notices for tardies could be cause for termination, no evidence in the record suggests that a termination for tardies ever occurred at the Santa Cruz Warehouse. None of the warehouse employees or supervisors in this case could recall any employee being terminated for tardies at any warehouse. Lamson Decl. ¶ 14; Christiansen Dep. 63:9–64:4; Boggiano Dep. 34:8–14; McKenzie Dep. 71:8–10; Finnell Dep. 53:21–25.

4

### 3. Lamson's and Scianna's Terminations

In January 2017, Jeremy Christiansen became the General Manager of the Santa Cruz Costco warehouse. Lamson Dep. 59:8–60:10. Lamson, Scianna, and other employees felt that Christiansen began a campaign to change the warehouse culture upon arrival. Lamson Decl. ¶ 17. Some employees felt that Christiansen disproportionately disciplined older, more experienced employees and favored younger, less experienced employees because he preferred a workforce that was easier to control. Dkt. No. 62, Ex. 5 (Ismael Torres Declaration), ¶ 7.

In May 2017, Costco's regional office conducted a routine unannounced warehouse operational audit of the Santa Cruz warehouse. Lamson Dep. 98:13–99:3. These occurred once or twice per year. *Id*. The May 2017 audit of the Santa Cruz warehouse was performed by Regional Operations Auditor Tamara Mayo-Neville. Neville Dep. 70:12–20. During her audit, Neville found that Lamson and Scianna had made changes to one another's schedules in WFC and that these changes appeared to be intended to avoid being charged with tardies. *Id*. 81:32–82:21. For example, on April 1, 2017, Scianna was scheduled to start work at 7:30 a.m. but she clocked in at 7:34 a.m.; the next day, Lamson changed Scianna's start time in WFC to 7:45 a.m. to remove the tardy. Lamson Dep. 222:20–224:6, Ex. 16.

Neville reported her findings to General Manager Christiansen and recommended a review by Costco's Central Payroll Department in Washington. *Id*; Christiansen Dep. 110:22–111:18. Christiansen responded that he needed permission from Darby Greek, regional manager, to involve Central Payroll. *Id*. He requested and received permission from Greek and told Neville to contact Central Payroll. *Id*. Theresa Ramirez from Central Payroll subsequently reviewed Lamson's and Scianna's WFC entries. Ramirez found the following issues:

1. Lamson and Scianna had made changes to one another's schedules in WFC which appeared to be intended to avoid being charged with tardies. *Id*. 81:32–82:21.

5

    2. Lamson and Scianna had made changes to the schedule of Lamson's husband, Greg, who also worked at the Santa Cruz warehouse. Scianna Dep. 158:3–21.

    3. Lamson and Scianna had and used supervisor and manager access codes that were not appropriate for their positions. Neville Dep. 87:25–122:1.

These findings were sent to Neville, who sent them to Greek. Greek Decl. ¶ 6. Greek relayed the findings to Christiansen. Greek Decl. ¶ 7. On June 8, 2017, Greek directed Christiansen to suspend Lamson and Scianna pending investigation and termination. Greek Decl. ¶¶ 7–8. Christiansen suspended Lamson on June 12, 2017, and Scianna on June 19, 2017. Lamson Dep. 123:20–124:8; Scianna Dep. 154:21 – 155:12. Both plaintiffs admitted to having made the scheduling changes but stated that they were previously given permission to make those changes by their former supervisor Anthony McKenzie. Lamson Dep. 136:21–139:21; Scianna Dep. 190:10–15. Christiansen and Finnell met with Lamson and Scianna and terminated them for falsification of time records on June 22, 2019. Lamson Dep. 243:9–18; Scianna Dep. 309:10–310:24.

### B. Procedural History

Plaintiffs filed their case in Santa Cruz Superior Court. Dkt. No. 1. Their complaint alleges causes of action for: age discrimination in violation of the Fair Employment and Housing Act; retaliation in violation of FEHA; failure to prevent discrimination in violation of FEHA; punitive damages under FEHA; failure to pay minimum wages and overtime premiums in violation of the Labor Code; failure to provide meal periods and ret breaks in violation of the Labor Code; inaccurate paystubs in violation of the Labor Code; and breach of contract. Dkt. No. 1, Ex. A. Costco removed the case to this Court. Dkt. No. 1. All parties consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c). Dkt. Nos. 9, 11.

## II. LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the nonmoving party, there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Bald assertions that genuine issues of material fact exist are insufficient. *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).

The moving party bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings, and, by its own affidavits or discovery, set forth specific facts showing that a genuine issue of fact exists for trial. Fed. R. Civ. P. 56(c); *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1004 (9th Cir. 1990) (citing *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)). All justifiable inferences, however, must be drawn in the light most favorable to the nonmoving party. *Tolan*, 134 S. Ct. at 1863 (citing *Liberty Lobby*, 477 U.S. at 255).

## III. DISCUSSION

### A. Age Discrimination

To make a prima facie showing of age discrimination, a plaintiff must establish: (1) that she was in a protected class; (2) that she was performing competently in the position she held; (3) that she suffered an adverse employment action; and (4) circumstances suggesting discriminatory motive. *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 355 (2000). Once a plaintiff makes a prima facie showing, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the defendant does so, the plaintiff bears the final burden to prove that the adverse employment action was a result of her protected status. *Id.* at 355–56. To establish discrimination based on disparate discipline, the plaintiff must show that the employer failed to discharge or similarly discipline another employee engaged in the same or similar misconduct. *McGrory v. Applied Signal Technology, Inc.*, 202 Cal. App. 4th 1510, 1535

7

(2013). Similarly-situated individuals would have the same supervisor, standards, and conduct without distinguishing circumstances. *Wills v. Superior Court*, 195 Cal. App. 4th 143, 172 (2011).

Here, the Court finds that the plaintiffs have made a prima facie showing of age discrimination because their burden to make this showing is "minimal" and "light." *Sandell v. Taylor-Listug, Inc.*, 188 Cal. App. 4th 297, 310 (2010). Lamson and Scianna have provided undisputed evidence to show that they were performing competently in their positions and had been doing so for many years. Lamson Decl. ¶¶ 2–8; Scianna Decl. ¶¶ 3–8. They were both terminated. Some circumstances, such as declarations from two other Costco Santa Cruz employees who resigned due to feeling that General Manager Jeremy Christiansen was "biased against older employees" and "favor[ed] younger employees," suggest discriminatory motive. Gyzicki Decl. ¶ 3; Torres Decl. ¶ 7.

Costco has provided a legitimate, nondiscriminatory reason for Lamson's and Scianna's terminations: they changed one another's schedules in WFC in an apparent attempt to avoid tardies. Neville Dep. 81:32–82:21. Lamson and Scianna admitted to this conduct. Lamson Dep. 136:21–139:21; Scianna Dep. 190:10–15. Now, the plaintiffs bear the burden of presenting strong enough evidence to overcome Costco's legitimate, nondiscriminatory reason for their termination. *Guz*, 24 Cal. 4th at 362. The Court FINDS that they have failed to do so.

**1. Jeremy Christiansen was Not the Decision-Maker**

The fundamental flaw with plaintiffs' age discrimination claim is that they have not provided evidence that the decision-makers at Costco who actually terminated them were motivated to do so based on age discrimination. All of the plaintiffs' evidence of discriminatory motive is about Jeremy Christiansen. For instance, plaintiffs point to Christiansen's promotions of employees who were in their twenties as evidence that he preferred younger workers. Lamson Decl. ¶ 17; Scianna Decl. ¶ 10. Other former Santa Cruz warehouse employees shared sentiments regarding Christiansen's animus towards older employees. Gyzicki Decl. ¶ 3; Torres Decl. ¶ 7.

8

However, Costco's unrebutted evidence clearly shows that Christiansen was not the person who decided to terminate Lamson and Scianna. Costco has shown, through declarations, deposition testimony, and email history, that Darby Greek was the primary decision-maker throughout the plaintiffs' suspensions, investigations, and terminations. *See* Greek Decl. ¶¶ 7–20. Christiansen sent Greek the findings of the Central Payroll audit. Greek Decl. ¶ 7; Christiansen Dep. 158:18–160:22. Greek told Christiansen to suspend Lamson and Scianna. Greek Decl. ¶¶ 7–8 and Ex. B; Christiansen Dep. 159:13–25. Greek discussed the situation with Jeff Abadir, Senior Vice President, and John McKay, Executive Vice President. Greek Decl. ¶ 10, 15–17, Ex. C. Greek gathered other information, such as statements from former managers, and sent those materials to Abadir and McKay with a recommendation that Lamson and Scianna be terminated. *Id*. Abadir and McKay approved the terminations. Greek Decl. Exs. F, G. Greek then directed Christiansen to terminate Lamson and Scianna. *Id.* Plaintiffs have provided no evidence that Greek, Abadir, or McKay harbored discriminatory motives—there is not even any evidence that Greek, Abadir, or McKay knew Lamson's or Scianna's ages.

Nonetheless, plaintiffs argue that Christiansen influenced their terminations. They argue that "[i]t is no coincidence that only five months after Christiansen's hire as GM," the audit leading to their terminations began. Dkt. No. 62 at 23. They also show that Christiansen was involved somewhat in the investigation and termination process. For example, he helped authorize Neville to contact Central Payroll to request a full audit. Neville Dep. 126:11–25. At Greek's direction, Christiansen was the person who informed Lamson and Scianna of their suspensions and took their statements and ultimately terminated them. Lamson Decl. ¶ 23. He also sent information about the audit to Abadir and Kevin Trejo, another employee from Costco Corporate (though Greek stated that she directed Christiansen to send this email). Abadir Decl. Ex. A at 7–9; Greek Decl. ¶ 10.

Plaintiffs also provided a declaration from another former Costco employee who stated that "warehouse managers would always say that Corporate was responsible" for terminations "so as not to look like the 'bad guy,' but, in practice, Managers made the

9

discipline recommendations, and Corporate 'rubber-stamped' them." Torres Decl. ¶ 7. Whether or not that was generally true, the evidence presented by both parties in this case shows that Christiansen was not the person who decided to terminate Lamson and Scianna.

No genuine issue of material fact exists as to the reality that Greek, with approval from Abadir and McKay, was the decision-maker regarding the terminations. Plaintiffs have not shown that Greek, Abadir, or McKay had a discriminatory motive.

**2. Plaintiffs Have Not Shown Animus Toward Older Employees**

The second problem with plaintiffs' age discrimination claim is that their allegation is actually more about discrimination based on tenure at Costco, not based on age. These characteristics are correlated: a person who has worked at Costco for a longer period of time is likely older. But an older person could also be very new to Costco. Plaintiffs' allegations of General Manager Jeremy Christiansen favoring younger employees are only loosely based on age—more precisely, they argue that Christiansen wanted to promote less experienced workers who would be easier to control and tried to penalize more experienced workers who were accustomed to a different workplace culture from before Christiansen's time. Lamson describes Christiansen as "edging out established employees, and hiring and promoting new, inexperienced individuals" without apparent regard to those individuals' ages. Lamson Decl. ¶ 17. She similarly states that Christiansen was "threatened by anyone who . . . knew the ins and outs of the – of the way Costco runs." Lamson Dep. 260:16–261:2. Scianna states that "[b]efore Jeremy Christiansen became General Manager, it was commonplace for mangers to delegate their duties to experienced employees . . . [w]hen Christiansen arrives, he shut us out and began a campaign to change the warehouse culture. He wanted to micromanage every aspect of the warehouse, and experienced employees wouldn't be so easily steamrollered." Scianna Decl. ¶ 10.

This evidence certainly suggests that Christiansen wanted to change the warehouse culture by giving leadership authority to newer employees who would execute his vision. However, it does not necessarily show that he only favored those who were younger over those who were older.

10

### 3. Plaintiffs Have Not Shown Disparate Treatment

Finally, plaintiffs have not supplied sufficient evidence of disparate treatment between younger and older employees. The plaintiffs' declarations estimate the ages of some employees who were promoted by Christiansen (e.g., "Brittany Ferrell (Front End Supervisor promoted to floor Manager) (aged early 20s)"). Lamson Decl. ¶ 17. They also provide declarations stating that some younger employees were not disciplined as harshly for similar misconduct. Scianna Decl. ¶ 11; Lamson Decl. ¶ 11; Torres Decl. ¶ 9; Gyzicki Decl. ¶ 12 (however, at least one of these incidents predates Christiansen's tenure, describing a disciplinary issue from April 2014 (Torres Decl. ¶ 9)).

One problem with these anecdotes is that the witnesses did not testify to their personal involvement in any of the incidents, so it is unclear whether their descriptions of the events are speculative or are reliable. Another problem is that none of the incidents seems to include a similarly-situated person as required under FEHA. *McGrory*, 202 Cal. App. 4th at 1535. Plaintiffs have not provided evidence that these other individuals had the same supervisor, same standards, or similar misconduct with no mitigating or distinguishing characteristics. *Wills*, 195 Cal. App. 4th at 172. The descriptions presented are vague, brief, and do not show sufficient similarities between the incidents.

Plaintiffs' evidence of animus towards older employees is similarly weak. Two former employees provided declarations stating that they resigned from their positions at Costco due to feeling that Christiansen was biased against older employees. Gyzicki Decl. ¶ 3; Torres Decl. ¶ 7. But neither were disciplined or terminated—they resigned voluntarily. Unlike in *Johnson v. United Cerebral Palsy Foundation*, where plaintiffs produced admissible declarations from employees who had experienced the same discipline for the same conduct (there, terminations after notifying their employer of their pregnancies), the declarations from Torres and Gyzicki do not show similarities to Lamson's and Scianna's terminations. 143 Cal. App. 4th 750 (2009).

The undisputed evidence shows that the decision-makers of the terminations had no discriminatory motivation, and that nonetheless General Manager Christiansen had a

11

preference for less experienced employees rather than strictly younger employees. Moreover, plaintiffs have not provided evidence of disparate treatment of similarly-situated individuals. The Court therefore GRANTS Costco's motion for summary judgment as to plaintiffs' age discrimination claim. The claim is hereby DISMISSED.

### B. Retaliation

Under FEHA, it is unlawful for an employer to discharge an employee because she has opposed any practices forbidden by FEHA, including discrimination or harassment based on age. Gov't Code § 12940(h); *Nealy v. City of Santa Monica*, 234 Cal. App. 4th 359, 380 (2015). To make a prima facie showing of retaliation under FEHA, a plaintiff must show: (1) that she was engaged in protected conduct; (2) that she suffered adverse employment action; and (3) that there was a causal relationship between the protected conduct and the adverse employment action. *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005).

Here, the Court has found that the plaintiffs have not shown that any discrimination occurred, and so their claim for retaliation likewise fails. The motion for summary judgment as to plaintiffs' retaliation claim is GRANTED and the claim is hereby DISMISSED.

### C. Failure to Prevent Discrimination

Under FEHA, it is unlawful for an employer to "fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Gov't Code § 12940(k). To succeed on a claim that an employer failed to prevent discrimination under FEHA, a plaintiff must show: (1) that she was subjected to actionable discrimination under FEHA; (2) that her employer failed to take all reasonable steps to prevent that discrimination; and (3) that this failure resulted in damages. *Taylor v. City of Los Angeles Department of Water and Power*, 144 Cal. App. 4th 1216, 1235 (2006).

Here, the Court has found that the plaintiffs have not shown at the first step that they were subjected to actionable discrimination under FEHA, so their claim for failure to prevent that discrimination likewise fails. The motion for summary judgment as to

12

1  plaintiffs' failure to prevent discrimination claim is GRANTED and the claim is hereby
2  DISMISSED.

### D. Punitive Damages

To seek punitive damages under FEHA, plaintiffs must provide clear and convincing evidence that a corporate officer, director, or managing agent engaged in, authorized, or ratified malicious, fraudulent, or oppressive conduct toward them based on a FEHA-protected status. Civ. Code § 3294; *Mathieu v. Norrell Corp.*, 115 Cal. App. 4th 1174, 1190 (2004). A "corporate officer, director, or other managing agent" means someone with substantial "discretionary authority over significant aspects of a corporation's business," including over "formal policies that affect a substantial portion of the company and are the type to come to the attention of corporate leadership." *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 566–67 (1999). The only such persons involved in this case were Greek, Abadir, and McKay; as the Court found above, the plaintiffs have presented no evidence that any of these officers engaged in, authorized, or ratified malicious, fraudulent, or oppressive conduct toward them based on any FEHA-protected status. The motion for summary judgment as to plaintiffs' punitive damages remedy under FEHA is GRANTED and that remedy is hereby DISMISSED.

### E. Rest Break, Meal Break, Minimum Wage, and Overtime Violations

Employers must make "good faith effort to authorize and permit rest breaks." *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1031 (2012). Similarly, California law requires employers to "provide a meal break" to employees. *Id*. at 1040. This means the employer "relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." *Id*. Employers need not police either rest breaks or meal breaks to ensure that they occur. *Id*. An employer is not liable for unpaid wages when the employee prevents the employer from acquiring knowledge of uncompensated work time. *Jong v. Kaiser Foundation Health Plan, Inc.*,

225 Cal. App. 4th 391, 395 (2014). Labor Code section 203(a) states that if an employee avoids payment, their employer is not liable for penalties.

Labor Code sections 1197 and 510 require employers to pay at least minimum wage for all hours worked and overtime pay for any overtime worked. Labor Code sections 201, 202, and 203 impose a penalty for employers that do not pay all wages due at termination.

Plaintiffs bring claims for rest period and meal break violations, unpaid wages, failure to pay wages due at termination, and overtime violations. Dkt. No. 1. These claims all arise out of the same factual bases: that Lamson and Scianna worked "off-the-clock," in particular by responding to phone calls and text messages from other Costco employees while they were not supposed to be working, including while on breaks at the warehouse and during non-work hours while they were at home. Lamson Dep. 295:3 - 295:3-19, 286:1-288:20, 294:15-298:19, 305:9-312:2; Scianna Dep. 240:4-241:11, 351:8-353:23, 355:23-360:2). Lamson and Scianna both notified Costco about this off-the-clock work during the investigation into their WFC schedule changes. *Id*. There is no dispute as to the fact that neither Lamson nor Scianna reported any of their off-the-clock work time to Costco at any point prior to their suspensions. *Id*.; Lamson Dep. 176:25-178:10, 255:2-23, 290:1-14, Ex. 23; Scianna Dep. 320:6-321:22, Ex. 62. Both plaintiffs state that they understood Costco's timekeeping and pay policies, that they knew how to report all time worked, and that they were paid overtime and double time when they reported overtime hours throughout their employment. Lamson Dep. 308:6-15, 263:23-264:11, 284:21-285:25, 331:20-332:10; Scianna Dep. 336:10-12, 352:9-15, 238:5-8, 313:23-314:6, 336:3-12. They also testified that their final paychecks were accurate. Scianna Dep. 311:5-313:7, Ex. 60.)

Here, the undisputed evidence shows that Costco met its legal obligation in providing both meal breaks and rest periods, even if it did not ensure that Lamson and Scianna took those breaks. Lamson Dep. 331:20-332:10, 343:9-344:19, Exs. 34, 35. Costco cannot be held liable for unpaid wages when the plaintiffs prevented Costco from acquiring knowledge of the time that they worked. *Jong*, 225 Cal. App. 4th at 395.

Similarly, Costco is not liable for penalties if an employee "avoids payment." Labor Code § 203(a). By not reporting their off-the-clock work, Lamson and Scianna created a situation in which Costco was not "willfully" failing to pay them. *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1201 (2008). The motion for summary judgment as to plaintiffs' claims for rest break, meal period, minimum wage, and overtime violations is therefore GRANTED and those claims are hereby DISMISSED.

**F. Breach of Contract**

The elements of a breach of contract claim, whether express or implied, are: (1) the existence of a contract; (2) the plaintiff's performance or excuse for nonperformance; (3) the defendant's breach; and (4) resulting damages to the plaintiff. *Coles v. Glaser*, 2 Cal. App. 5th 384, 391 (2016); *Green Valley Landowners Assn. v. City of Vallejo*, 241 Cal. App. 4th 425, 433. (2015). Employment relationships are fundamentally contractual. *Guz*, 24 Cal. 4th at 335. An employment contract that requires good cause for termination requires that the employer come to a "reasoned conclusion" that is "supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond." *Cotran v. Rollins Hudig Hall Int'l, Inc.*, 17 Cal. 4th 93 (1998). An implied contract is one for which the "existence and terms . . . are manifested by conduct." Cal. Civ. Code § 1621.

Here, the parties dispute what contract existed in the first place. Costco argues that the Employment Agreement controls; Plaintiffs argue that an implied contract, ratified by the parties' conduct, existed with different terms than the Employment Agreement.

The Employment Agreement between Costco and the plaintiffs stated that Costco had the right to terminate employees for "good and sufficient cause." Lamson Dep., Exp 27; Scianna Dep., Ex. 64. The EA included specific grounds that constituted "good cause." *Id*. One such ground for termination was "falsifying of Company records or timecards, including omitting facts or willfully giving wrong or misleading information." *Id.* at Section 11.3. But the EA also gave Costco the exclusive right to define "good cause." *Id.* at Section 4.8. The EA required that an Executive Vice President must review

15

terminations of long-term employees. *Id.* at 28.

Costco argues in its motion for summary judgment and reply brief that the EA was a "satisfaction contract," that is, that Costco was the sole judge of its own satisfaction of plaintiffs' performance and could terminate them for any subjective dissatisfaction so long as it had a bona fide reason for doing so. Dkt. No. 56 at 19; Dkt. No. 63 at 2. Costco also emphasizes that it was not limited to the explicit grounds for termination enumerated in the EA when finding good cause to terminate—Costco argues that it could terminate for "**any** good and sufficient cause it finds, not just the 'Causes for Termination' listed in Section 11.3." Dkt. No. 63 at 2 (emphasis in original). But this argument is of no moment because Costco *did* terminate Lamson and Scianna for causes listed in Section 11.3: Lamson was terminated for "falsifying company documents" and Scianna was terminated for both "falsifying company documents" and "jeopardiz[ing] order and safety." Dkt. No. 62, Exs. J-D000003, J-D000328 (termination forms).

Plaintiffs argue that they had an implied contract with Costco that allowed them to make changes to one another's schedules. Dkt. No. 62 at 17. It is undisputed that Lamson and Scianna were authorized to make changes to schedules in WFC in general—indeed, doing so was a core part of their job descriptions. Lamson Decl. ¶ 8. As the most senior employee in the Administration department, Lamson's job even included approving schedule changes for other employees. Lamson Decl. ¶ 12. Moreover, Lamson and Scianna were treated as managers for many years: with no individual manager for the Administration department, they were given significant responsibility and authority to act in a managerial role. Lamson Decl. ¶¶ 4–8. Costco's Central Payroll may have reacted with great shock at discovering the plaintiffs' level of access and permission during their audit of the Santa Cruz warehouse. But Costco never suggested that Lamson or Scianna gained this access inappropriately or without authorization. Rather, Lamson and Scianna performed the duties to which they were assigned by their supervisors, even when those duties exceeded their job descriptions. Lamson Decl. ¶ 6.

There exists a genuine dispute of material fact as to whether Lamson and Scianna

16

were given explicit permission to change one another's schedules in WFC. If they had this permission, especially in context of their significant managerial authority overall, there may have been an implied contract, the terms of which allowed this conduct. Such an implied contract may mean that Costco lacked good cause for their terminations. If they did not have this permission, then Costco may have had good cause to terminate them for falsifying records.

Lamson says that she and Scianna were "instructed by Anthony McKenzie to change the schedule to what [they] actually worked" because their job duties "were not time sensitive to a starting shift time, as compared to other employees who were primarily in a direct customer service role." Lamson Decl. ¶ 12. Likewise, Scianna states that the plaintiffs "were instructed by Anthony McKenzie to approve and make schedule changes so as not to bother him about them every time." Scianna Decl. ¶ 9. Former Front End Supervisor Anna Gyzicki recalled that "Ms. Lamson's and Ms. Scianna's superiors, including Anthony McKenzie, were certainly fully aware and accepting of these routine practices" and even "personally heard Mr. McKenzie give Ms. Lamson and Ms. Scianna authorization to alter their schedules in this way." Gyzicki Decl. ¶ 9. Former manager of the Meat Department Ismael Torres also knew Anthony McKenzie to be "certainly fully aware of and accepting of these routine practices." Torres Decl. ¶ 6. These statements are consistent with those that the plaintiffs made immediately upon Central Payroll's discovery of the schedule changes. Lamson told Christiansen that McKenzie's former supervisor had given McKenzie "grief" about employees not working their posted schedules, which was apparent based on the red box flag that appeared in WFC. Lamson Dep. 136:21–137:10. Lamson said that McKenzie told her "to make sure [he didn't] get those red boxes anymore." Lamson Dep. 137:18–139:21. The plaintiffs' evidence suggests that they were instructed to change their schedules in WFC not just for their own sakes but also to help their former manager. This agreement may have created an implied contract between the parties allowing Lamson and Scianna's conduct.

Costco disputes this evidence. McKenzie told Christiansen, and Christiansen

17

communicated to his superiors, that this supposed permission to make schedule changes was never authorized. Abadir Decl. Ex. A, 7–9; Christiansen Dep. 162:3–9, 126:1–127:25. These contradictions create a genuine dispute as to material facts.

Due to this factual dispute, the Court is unable to determine what contract controls: the Employment Agreement, or an implied contract. As the Court discussed above, whether or not Lamson and Scianna had explicit permission to make schedule changes goes to the question of whether an implied contract existed that allowed their conduct. The question of what contract existed and what its terms were is a question for a factfinder, and is thus inappropriate for the instant motion for summary judgment. The Court cannot move on to the other elements of the plaintiffs' breach of contract claim (the plaintiffs' performance or excuse for nonperformance, the defendant's breach, and resulting damages) without first determining the terms of the relevant contract. It cannot do so on the record presented. Therefore, Costco's motion for summary judgment is DENIED as to the plaintiffs' breach of contract claim.

## IV. CONCLUSION

The Court FINDS that no genuine issue of material fact exists for any of plaintiffs' claims except their claim for breach of contract. The motion for summary judgment is GRANTED as to plaintiffs' age discrimination, failure to prevent discrimination, retaliation, and various wage and hour claims and their punitive damages remedy. Accordingly, those claims are DISMISSED. The Court finds that the plaintiffs have shown that genuine issues must be decided by a factfinder as to their breach of contract claim. Specifically, plaintiffs have created a triable issue as to the question of whether an implied contract existed and, if so, what the terms of that implied contract were. The motion for summary judgment as to the breach of contract claim is hereby DENIED.

**IT IS SO ORDERED.**

Dated: September 6, 2019

NATHANAEL M. COUSINS
United States Magistrate Judge